**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **JAMES C. HASTINGS,** | ) |
| | ) |
| Plaintiff, | ) Case No. 08 C 5041 |
| | ) |
| v. | ) Magistrate Judge |
| | ) Martin C. Ashman |
| **MICHAEL J. ASTRUE,** | ) |
| Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

Plaintiff, James C. Hastings ("Plaintiff"), seeks judicial review of a final decision of

Defendant, Michael J. Astrue, Commissioner of Social Security ("Commissioner"), denying his

applications for Disability Insurance Benefits ("DIB") and Supplemental Social Security Income

("SSI"). Before this Court is Plaintiff's Motion for Summary Judgment or Remand and

Defendant's Cross-Motion for Summary Judgment. The parties have consented to have this

Court conduct any and all proceedings in this case, including entry of final judgment. 28 U.S.C.

§ 636(c); N.D. Ill. R. 73.1(c). For the reasons set forth below, this Court affirms the

Commissioner's decision.

## I. Procedural History

Plaintiff filed applications for DIB and SSI on August 24, 2001. (R. 49-51.) He alleged

his disability commenced on December 29, 2000. (R. 49.) The Social Security Commission

denied his claim on October 17, 2001, and again on January 9, 2002, after Plaintiff had asked for

reconsideration'. (R. 28-29.)

After a second denial, Plaintiff filed a timely request for a hearing on March 12, 2002. (R. 41-42.) The hearing took place on April 16, 2003, before Administrative Law Judge ("ALJ") John Mondi. (R. 318-53.) On June 16, 2003, the ALJ found that Plaintiff was not disabled and denied her claim for benefits. (R. 400-08.) Plaintiff filed a timely Request for Review of the hearing decision with the Social Security Administration's ("SSA") Appeals Council (the "Appeals Council"). (R. 18-20.) When the Appeals Council denied review on August 13, 2004 (R. 5-7), the ALJ's decision became the final decision of the Commissioner. 20 C.F.R. § 404.981.

Plaintiff filed an action in the United States District Court for the Northern District of Illinois seeking judicial review. (R. 414-62.) While his action was pending, Plaintiff reapplied for DIB and SSI. (R. 489-91.) On September 16, 2005, Magistrate Judge Arlander Keys reversed ALJ Mondi's decision and remanded the case for further proceedings before the Commissioner. (R. 414-62.)[1]

Another hearing was held on July 25, 2006, in front of ALJ Denise McDuffie Martin ("ALJ Martin") during which ALJ Martin heard testimony from Plaintiff, a vocational expert, and a board certified orthopedic surgeon. (R. 750-802.) On August 10, 2006, the ALJ denied Plaintiff's application, finding that he was not disabled. (R. 372-81.) After the Appeals Council declined to assume jurisdiction, (R. 205), ALJ Martin's decision became the final decision of the Commissioner. 20 C.F.R. § 404.981. Plaintiff filed the action before this Court on January 12, 2009.

---

[1] Plaintiff's new applications were consolidated in the proceedings on remand. (R. 142.)

## II. Background

### A.    Plaintiff's Background

Plaintiff was born on March 31, 1959 (R. 324, 415), and was 40 years old at the onset date of his alleged disability (R. 49, 750, 756). Plaintiff has an eleventh grade education (R. 72, 324), but reads at an eighth grade level and has fourth-grade math skills (R. 101, 337). Plaintiff tried but was unable to obtain a GED because he could not sit through the two and a half hour class. (R. 324-35, 336, 337-39, 346, 757-58.) Additionally, he has been unemployed since March or April of 2001. (R. 325-327.) In the past, however, he worked as a janitor, bus driver, truck driver, laborer, and merchandise stocker. (R. 67, 79, 594, 758-59.)

### B.    Medical Treatment and Opinions

#### 1.    The Injury

Plaintiff injured his back at work on December 29, 2000, while lifting a pile of wood. (R. 106, 107, 328.) He sought emergency room care two days later and was prescribed pain medication and muscle relaxants. (R. 106-09.) The x-rays taken showed mild disc space narrowing at L5-S1. (R. 110.)

#### 2.    Dr. Yatin Shah

From January to March of 2001, Plaintiff was treated by Dr. Shah. (R. 162-79.) An MRI on January 11, 2001, showed marked degeneration of the right side of the disc at L5-S1 and a mild diffuse protrusion of the disc producing slight anterior indentation on the thecal sac. There also was a very mild right neuroforaminal stenosis at the L5-S1 level due to the disc degeneration

- 3 -

and diffuse protrusion of the disc. (R. 173.) Dr. Shah prescribed medication and physical therapy. (R. 163, 169, 171.) Plaintiff attended twenty-five physical therapy sessions while in Dr. Shah's care.

In February 2001, Dr. Shah indicated that Plaintiff could do light work subject to certain restrictions: Plaintiff could only do minimum sitting, bending or stooping and no heavy lifting (maximum of 30 pounds), pushing or pulling. (R. 169, 170.) However, in March 2001, Dr. Shah indicated that Plaintiff was "unable to work" and referred him to a work-hardening program. (R. 167.)

### 3. Dr. Lenard Rutkowski and the Pain Clinic

Thereafter, Plaintiff began seeing a neurosurgeon, Dr. Lenard Rutkowski. (R. 243.) Dr. Rutkowski diagnosed degenerative disc disease at L3-L4 and L5-S1 and prescribed more physical therapy. (R. 181-97.) Plaintiff attended twenty-four more physical therapy sessions and also tried a Transcutaneous Electrical Nerve Stimulator unit ("TENS unit") neither of which seemed to help his pain. (R. 181, 188.)

In July 2001, Plaintiff decided to seek treatment from a pain clinic. (R. 181.) At the clinic, Plaintiff received epidural steroid injections which he reported did not have any effect on his pain. (R. 208.) During a consultation in November 2001, Dr. Mauricio Morales, opined that the mild degenerative disc disease shown on Plaintiff's MRI did not explain the degree of pain Plaintiff was reporting. (R. 208.)

### 4. Veteran's Administration

Beginning in July 2001, Plaintiff sought a second opinion and treatment through the Veteran's Administration ("VA") and since has received most of his treatment there. (R. 219.) Treating medical professionals at the VA prescribed various medications for Plaintiff. (R. 261, 268, 271, 281, 282.)

However, Plaintiff reported that he did not always take his medications because some of them caused drowsiness and he could not drive after taking them. (R. 341-42.) Also, while receiving treatment through the VA, Plaintiff attended pain clinics, two work-hardening programs, and numerous physical therapy sessions. (R. 254, 269, 272, 323, 354-55, 621, 664, 665, 669, 753, 761.) During one of his physical therapy appointments in November 2002, Plaintiff commented to the physical therapist that his "lawyer stated it wouldn't be bad if [he] got worse after therap[y]." (R. 270.)

Plaintiff also tried a TENS unit again on a few occasions (R. 255, 682, 753, 763), and attended a chronic pain program at the VA (R. 261, 269, 282-83). He also underwent multiple epidural steroid injections, which initially gave minimal relief but later (in 2005 and 2006) yielded better results. (R. 267, 322, 611, 667, 699, 701, 734, 737, 761, 763.)

In March 2002, Plaintiff's MRI showed broad based disc herniation at L5-S1 and an annular rent at L3-4. (R. 230, 231.) Another MRI taken in December 2004 suggested that there were annular tears at L3-4 and L4-5 and showed that the broad based herniation at L5-S1 appeared much less prominent then the previous MRI. (R. 614, 615.) Plaintiff also had an electromyography ("EMG") test taken in May 2005 which was normal. (R. 611-612.)

- 5 -

## 5.    Functional Capacity Evaluations

In September 2001, Dr. Rutkowski referred Plaintiff for a functional capacity evaluation. (R. 203.) The examiner found that Plaintiff had the physical capabilities and tolerance to work at a light-medium work level with a thirty-five pound maximum from floor to shoulder work level. (R. 203.) The examiner further recommended that the positions of stooping and twisting should be decreased or limited. (R. 203.) The examiner's report further notes that Plaintiff demonstrated no difficulties sitting. (R. 205.)

In September 2004, a state agency medical consultant conducted a Physical Residual Functional Capacity Assessment. (R. 653.) The consultant found that Plaintiff could occasionally lift twenty pounds, frequently lift ten pounds, stand or walk at least two hours in an eight hour work day, and needed to alternate sitting and standing to relieve pain or discomfort. (R. 654.) The consultant further found that Plaintiff could only occasionally climb, stoop, kneel, crouch or crawl, and that he could not climb ladders, ropes or scaffolding. (R. 655.)

In February 2005, a state agency medical consultant conducted a Physical Residual Functional Capacity Assessment. (R. 645.) During that examination the consultant found that Plaintiff could occasionally lift twenty pounds, frequently lift ten pounds, stand or walk at least two hours in an eight hour work day and sit, with normal breaks, for about six hours in an eight hour work day. (R. 646.) The consultant also found that plaintiff could only occasionally climb, balance, kneel or crawl, and should avoid concentrated exposure to extreme cold and hazards such as machinery or heights. (R. 647, 649.)

Plaintiff submitted himself for a Functional Capacity Evaluation in March 2005 "in order to see what condition [he was] in for finding employment." (R. 614-617.) The examiner noted

that Plaintiff sat comfortably during the intake interview process without showing increased discomfort and sat for thirty minutes while filling out a questionnaire. (R. 615.) He further observed that Plaintiff showed no apparent signs of pain distress and did not report any pain or discomfort while sitting to fill out papers or while putting on and taking off his shoes. (R. 615.) Plaintiff was found to have a maximum lift ability of thirty-five pounds with rest periods in between. (R. 616.) Plaintiff also answered four out of five questions indicating inappropriate symptoms in the Waddell's questionnaire. (R. 616.) Also, on the Revised Oswestry Low Back Disability questionnaire, Plaintiff's perceived disability showed a crippled category. (R. 616.) He also scored a forty-three in his impression of pain on the McGill questionnaire which indicates a poor psychodynamic level. (R. 616.)

## C. Prior District Court's Remand Order

Magistrate Judge Arlander Keys remanded ALJ Mondi's decision in an opinion dated September 16, 2005. Judge Keys found the ALJ's findings deficient in the following respects:

1. The ALJ failed to address relevant treatment records documenting the extent of treatment undertaken by Plaintiff to relieve pain. (R. 442.) Specifically, the ALJ did not address the results from Plaintiff's extensive physical therapy treatments. (Id.)

2. The ALJ provided an incomplete discussion of Plaintiff's treatment at the Edward Hines VA clinic. (R. 443.) At a minimal level, the ALJ was required to explain his reasoning for rejecting lines of evidence that support Plaintiff's claim. (Id.)

3. The ALJ did not address Dr. Shah's findings or articulate any reasons for discounting the treating physician's evidence. (R. 444.) On remand, the Court ordered that the

- 7 -

ALJ examine what weight, if any, to give Dr. Shah's findings. (R. 445.) In addition, the Court instructed the ALJ to address the medical findings of Plaintiff's other treating physician, Dr. Rutkowski. (R. 445.)

4.      The ALJ did not sufficiently explain his finding that Plaintiff was not credible. (R. 450.) The ALJ overlooked relevant pieces of evidence that could have supported Plaintiff's claims of pain. (*Id.*) The relevant pieces of evidence include: the side effects of Plaintiff's medication, the extent of treatment Plaintiff underwent to control and manage his pain, and also Plaintiff's reports of functional limitations regarding sitting, standing, or walking for prolonged periods as a result of pain. (R. 450-452.)

5.      The Court was unable to tell whether the ALJ examined the full range of the medical evidence and investigated medical findings that support Plaintiff's complaints of pain. (R. 453.) The ALJ also failed to address Plaintiff's side effects of medication. (*Id.*)

6.      Further explanation was necessary of the inconsistencies between Plaintiff's complaints of pain and Plaintiff's daily activities. (R. 454.)

## D.      The Second Hearing for Benefits

On July 25, 2005, the SSA held a second hearing on the issue of Plaintiff's benefits. (R. 752.) ALJ Denise McDuffie-Martin presided over the hearing. (R. at 752.)

### 1.      Plaintiff's Testimony

The hearing began with Plaintiff's testimony. (R. 755-89.) Plaintiff testified about his educational background, his attempts to get a GED, and his prior work experience; this testimony

- 8 -

was consistent with information already described in this Opinion. (R. 756-59.) Plaintiff further testified that, since the last hearing, he has received all of this treatment at Hines VA (R. 759), which is about thirty miles from his home in Joliet and the drive causes his back to ache. (R. 763-64.) Plaintiff also testified that he had asked his doctors at the VA to change one of his pain medications because it can cause fatal liver damage and he had been experiencing stomach pains. (R. 761-62.) He also stated that he does not take the recommended amount of this pain medication because he is afraid of getting liver damage. (R. 762.) Additionally, Plaintiff stated that he missed some physical therapy appointments because of the three-day job he had at the Meijer Grocery Store. (R. 765.) According to Plaintiff, he got the job at Meijer to avoid going to jail for violating a court order in a child support proceeding. (R. 765.) Plaintiff testified that he had missed other physical therapy appointments because he "messed up [his] schedule" and had to talk to the doctor about rescheduling them. (R. 765.) When asked to explain, in his own words, why the doctors think he has pain, Plaintiff stated that the doctors "said something about arthritis," and also attributed it to a decrease in Plaintiff's activity. (R. 766.)

Regarding his daily activities, Plaintiff testified that he usually wakes up off and on throughout the night and takes his pain pill as soon as he gets up. (R. 767.) He also stated that he takes his daughters to and from school as often as he can. (R. 767.) Plaintiff stated that his trailer is not very clean because he has trouble vacuuming and that his daughters help him around the house when they can. (R. 767-68.) Plaintiff also testified that he does not have any trouble doing laundry. (R. 772.) When he is not doing household chores or driving his daughters around, Plaintiff said that he usually watches television, talks to his mom on the phone or visits his mom at her home. (R. 772.) He stated that he is most comfortable when he is sitting with his legs

elevated or when he is laying with a pillow under his feet. (R. 771.) Plaintiff testified that he gets

money for gas from his mother and his daughters' grandmother, and that the VA pays his rent and

gives him vouchers for food. (R. 768.)

Plaintiff testified that his level of pain since the last hearing has stayed the same, and that

he did not think he could hold a job for more than a few days because of it. (R. 770.) He further

stated that both his pain and pain medication impair his memory and ability to concentrate.

(R. 770.) Plaintiff also testified that both the doctors at the VA and Dr. Rutkowski told him that

surgery would not help. (R. 774.) Plaintiff testified that he requested the FCE in March 2005

because he wanted to pinpoint the problem. (R. 776-77.) He also testified that he does not

always take his pain medication because he is "trying to get used to the pain," and because he

"can't do stuff . . . when [he's] on medication." (R. 778.)

Plaintiff testified that he usually sits for about twenty to thirty minutes before he has to

get up, and that he can walk about a block or two. (R. 781.) He also testified that he can stand

for about twenty minutes at a time. (R. 782.) Plaintiff also testified that he was afraid to go back

to work because he was not sure if he could handle an every day job, and it would require him to

give up all his assistance from the VA and other sources. (R. 783-84.) When questioned by the

medical expert, Dr. Daniel Girzadas ("Dr. Girzadas"), Plaintiff testified that he could sit all day

but that he would have to get up because of the pain.[2] (R. 787.) Dr. Girzadas then commented

that Plaintiff had been sitting for forty-five minutes and asked how Plaintiff was doing. (R. 787.)

Plaintiff said that he was feeling "pain" and that he had "been wanting to get up" because it

---

[2] In response to the medical expert's question about whether Plaintiff could sit all day, Plaintiff said, "I know I couldn't sit all day, I could, I'd have to be up, you know, try to get up." (R. 787.)

- 10 -

would "help some." (R. 787.) Dr. Girzadas told Plaintiff that he could get up if he wanted and it appears from the record that Plaintiff stood at that point.[3] (R. 788.)

## 2. Medical Expert's Testimony

Next, the ALJ called medical expert, Dr. Daniel Girzadas, to testify. (R. 786.) Dr. Girzadas testified about Plaintiff's medical history; this testimony was consistent with information already described in this Opinion. (R. 790-91.) Dr. Girzadas further testified that Plaintiff's condition did not meet or equal any listed impairment, and that Plaintiff required some work related restrictions. (R. 792.) He stated that Plaintiff could lift 20 pounds occasionally and10 pounds frequently; stand, walk at least two hours in an eight-hour day; and sit for six-hours in an eight-hour day. (R. 792.) Additionally, Dr. Girzadas noted that Plaintiff could only use ramps and stairs occasionally and could never use ladders, ropes or scaffolds. Finally,

_____        _____

[3] The parties dispute at what point Plaintiff actually stood during the hearing. (Pl.'s Mem. 14-15; Def.'s Mem. 14.) The exchange between Dr. Girzadas and Plaintiff went as follows:

Medical Expert: Now you've been sitting here about 45 minutes.

Plaintiff: Right.

Medical Expert: How are you doing?

Plaintiff: Pain. I've been wanting to get up, it feels like if I get up it'll help some.

Medical Expert: Well, if you want to get up you can get up, there's no problem with that.

(R. 787-88.)

Plaintiff: Yeah, that's - - I feel shaky.

(R. 787-88.)

Dr. Girzadas stated that Plaintiff should avoid all exposure to unprotected heights, hazardous moving machinery, and concentrated exposure to gases, fumes, odors, unclean conditions, and extreme temperatures. (R. 792.)

When questioned by Plaintiff's attorney, Dr. Girzadas testified that annular tears can cause pain and that Plaintiff's MRIs had showed one annular tear and suggested that there might have been two tears. (R. 793.) Dr. Girzadas also testified that it is "possible" for muscle spasms to cause pain and that the medical records showed that Plaintiff has had muscle spasms. (R. 793.) Dr. Girzadas testified that Plaintiff had a condition that causes pain at some level and that Plaintiff would tend to have good and bad days. (R. 793-94.)

### 3. Vocational Expert's Testimony

The ALJ next called vocational expert ("VE"), Cheryl Hoiseth, to testify. (R. 797.) The VE stated that she reviewed Plaintiff's file and had been present throughout the entire administrative hearing. (R. 794.) The VE testified that Plaintiff was a younger worker with a limited education whose past relevant work mostly included jobs at an unskilled and heavy exertional levels. (R. 797.) The VE testified that Plaintiff had also held two driving jobs which was semi-skilled work at a medium exertional level. (R. 797.)

The VE also testified that a hypothetical person needing the restrictions outlined by Dr. Girzadas would not be capable of doing Plaintiff's past relevant work. (R. 798.) The VE, however, testified that this hypothetical person would be able to hold other jobs in the national economy. (R. 798.) The VE identified two jobs that would accommodate the limitations of the hypothetical person. (R. 798.) The first position was an order clerk, which is at the sedentary

exertional level. (R. 798.) The VE estimated that approximately 2,000 order clerk jobs were available. (R. 798.) The second position was a cashier, which is a semi-skilled job. (R. 798.) The VE estimated that approximately 26,000 cashier jobs were available. (R. 798.) The VE further testified that the jobs she identified were consistent with those found in the Dictionary of Occupational Titles. (R. 798.)

When questioned by Plaintiff's counsel, the VE testified that the semi-skilled cashier job was appropriate for the hypothetical because there was a good work history, the stock clerk position was "roughly transferable" to the cashier job, and that having a stock clerk position on a resume would show that this person was likely able to learn the work. (R. 799.) The VE also testified that order clerk jobs are in hotels and gave an example of one such job in which the order clerk answers telephones and takes orders for room service. (R. 799.) She also testified that to hold either of these jobs a "person has to be in the seated position at a minimum of [forty-five] minutes out of an hour." (R. 800.) She added that a person who had to alternate between sitting and standing every half hour could not do such a job while a person who could alternate every forty-five minutes or after forty-five minutes in an hour could do such a job. (R. 800.) The VE testified that what was important for both jobs was "[forty-five] minutes of[] [] good[,] solid, productive time." (R. 801.) The VE also testified that a person in either job could not miss two days in a month, and that a person just starting the job would probably only be able to several hours in the first month of work. (R. 801.)

- 13 -

### III. ALJ Martin's Findings

The ALJ made the following findings in an opinion dated August 10, 2006:

1.  The claimant met the insured status requirements of the Social Security Act through March 31, 2006.

2.  The claimant has not engaged in substantial gainful activity since April 5, 2000, the alleged onset date (20 CFR 4041520(b), 404.1571 *et. seq.*, 416.920(b) and 416.971 *et. seq.*).

    *   *   *

3.  The claimant has the following severe impairment: chronic low back pain (20 CFR 404.1520(c) and 416.920(c)).

    *   *   *

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

    *   *   *

5.  After careful consideration of the entire record, I find that the claimant has the residual functional capacity to lift and/or carry and to push and/or pull 10 pounds frequently and 20 pounds occasionally, to stand and/or walk two hours in an eight-hour workday, and to sit about six hours in an eight-hour workday, subject to the ability to alternate between sitting and standing after forty-five minutes due to pain. I further find that he could not use foot/leg controls or climb ladders, ropes or scaffolds. He could occasionally climb ramps/stairs, balance, stoop, kneel, crouch, or crawl. He could not work at unprotected heights or around moving machinery and he needs to avoid concentrated exposure to dust, fumes, gases, unclean conditions and temperature extremes. This residual functional capacity assessment allows for a limited range of sedentary work.

    *   *   *

6.  The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

                            *   *   *

7.  The claimant was born on March 31, 1959. He was forty-one years old on April 5, 2000, the alleged disability onset date, and is currently forty-seven years old. According to the regulations, he is considered to be a younger individual (20 CFR 404.1563 and 416.963).

8.  The claimant has a limited education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.  Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled" whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1560(c), 404.1566, 416.960(c), and 416.966).

                            *   *   *

11. The claimant has not been under a "disability," as defined in the Social Security Act, from April 5, 2000, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(R. at 372-81.)


## IV. Discussion

A claim of disability is determined under a sequential five-step analysis. See 20 C.F.R.

§ 404.1520; 20 C.F.R. § 416.920. The court considers at the first step whether the claimant is

engaging in substantial gainful activity. 20 C.F.R. § 404.1520(4)(i). The second step evaluates

whether an alleged physical or mental impairment is severe, medically determinable, and meets a

durational requirement. *Id.* § 404.1520(4)(ii). The third step compares the impairment to a list of

impairments that are considered conclusively disabling. *Id.* § 404.1520(4)(iii). If the impairment meets or equals one of the listed impairments, then the applicant is considered disabled; if the impairment does not meet or equal a listed impairment, then the evaluation proceeds to step four. *Id.* The fourth step assesses the applicant's RFC and ability to engage in past relevant work. *Id.* If an applicant can engage in past relevant work, she is not disabled. *Id.* § 404.1520(4)(iv). If the applicant cannot engage in past relevant work, the court assesses at the fifth step whether he can engage in other work in light of his RFC, age, education and work experience. *Id.* In this case, at steps one and two, the ALJ determined that Plaintiff had not engaged substantial gainful activity, and that he had a severe impairment due to chronic low back pain. (R. 375.) At step three, the ALJ determined that this impairment did not meet or medically equal the listed impairments. (R. 375.) Thus the ALJ proceeded to assess Plaintiff's RFC and ability to engage in past relevant work as part of step four. The ALJ determined that Plaintiff was "unable to perform any past relevant work." (R. 379.) However, the ALJ concluded that Plaintiff retained the RFC to perform "a limited range of sedentary work." (R. 375.) Finally, at step five, the ALJ found that "there are jobs that exist in significant numbers in the national economy that [Plaintiff] can perform." (R. 380.) Thus the ALJ concluded that Plaintiff was not disabled. (R. 381.)

Plaintiff argues that there are several bases upon which this Court should reverse and remand the ALJ's conclusion that Plaintiff is not disabled. First, Plaintiff argues that the ALJ's step-five determination was erroneous because she used flawed evidence to support her conclusion that Plaintiff could perform other work. Second, Plaintiff argues that the ALJ's determination that Plaintiff could remain seated for only forty-five minutes was not supported by substantial evidence or factually explained. Third, Plaintiff argues that the ALJ's decision is

- 16 -

erroneous because the ALJ failed to address the concerns raised by the district court in a prior remand order.

Under 42 U.S.C. § 405(g), a district court may affirm, modify, or reverse an ALJ's decision. The scope of this review is limited, however, as the court "may [not] . . . reweigh evidence, resolve conflicts in the record, [or] decide questions of credibility." *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004). The court's "task is limited to determining whether the ALJ's factual findings are supported by substantial evidence." *Id.* Evidence is substantial "if a reasonable person would accept it as adequate to support the conclusion." *Id.* Additionally, the court must review the ALJ's decision to ensure the ALJ has built an "accurate and logical bridge from the evidence to his conclusion so that . . . a reviewing court . . . may assess the validity of the agency's ultimate findings and afford a claimant meaningful judicial review." *Id.* at 1002. Where the ALJ's decision "lacks evidentiary support or is so poorly articulated as to prevent meaningful review, the case must be [reversed and] remanded." *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002). The Court addresses Plaintiff's arguments in turn.

## A.      Step Five Determination

Plaintiff argues that the ALJ erred in finding that Plaintiff was not disabled under step five because the ALJ did not "accurately and logically explain" her conclusion. (Pl.'s Mem. 10.) Specifically, Plaintiff claims the ALJ's decision must be reversed because she based her decision on flawed VE's testimony. (Pl.'s Mem. 10.) Plaintiff argues that the VE's testimony was flawed because it was based on the assumption that Plaintiff's stock clerk job at Meijer provided Plaintiff with enough skills to perform semi-skilled work. (Pl.'s Mem. 10-11.) However, Plaintiff argues,

Plaintiff only held the stock clerk position for three days and could not have learned transferable skills within that time frame. (Pl.'s Mem. 10.) Thus, because the ALJ relied on flawed VE testimony, Plaintiff appears to argue that the ALJ's conclusion did not have sufficient evidence to build an accurate logical bridge between the evidence and the result. (Pl.'s Mem. 9-11.)

In response, the Commissioner argues that the VE's testimony constituted substantial evidence upon which the ALJ may base her decision. (Def.'s Mem. 7-8.) Moreover, the Commissioner argues that this Court must uphold the ALJ's decision because the VE's testimony was unchallenged in the original administrative hearing. (Def.'s Mem. 7-8.)

At step five, the Commissioner has the burden of providing evidence that Plaintiff had the ability to engage in other work existing in significant numbers in the national economy. *Young v. Sec'y of Health & Human Servs.*, 957 F.2d 386, 389 (7th Cir. 1992). VE testimony may serve as substantial evidence that a Plaintiff can perform a significant number of jobs in the national economy. *Sims v. Barnhart*, 309 F.3d 424, 432 (7th Cir. 2002). Thus, to provide accurate testimony, the VE must understand the full extent of Plaintiff's situation so that the VE does not err in finding that a Plaintiff is capable of performing work in the economy that Plaintiff cannot truly perform. *Young*, 362 F.3d at 1003. Generally, "an ALJ [may] assume that the vocational expert included all of [Plaintiff's] limitations in his assessment of the number of jobs that the applicant can perform" if the VE reviewed Plaintiff's file and observed the information raised at Plaintiff's administrative hearing. *Id*; *see also Ragsdale v. Shalala*, 53 F.3d 816, 820-21 (7th Cir. 1995).

First, Plaintiff claims the VE's testimony is flawed because she stated that Plaintiff "'had gotten jobs such as . . . stock clerk, which is roughly transferable,' and that such a job history

- 18 -

would show that he would be 'likely able to learn this work.'" (R. 799.) This statement alone does not show that the VE relied on skills Plaintiff learned at his stock clerk position to make her determination. At best, this statement shows that Plaintiff has an ability to *learn* how to perform the cashier and order clerk positions because he had been *hired* for jobs like the stock clerk position in the past—not because of the skills he acquired therein.

Indeed, although the ALJ instructed the VE to base her testimony on a person with the same work experience as Plaintiff, the record shows that the VE considered only Plaintiff's construction laborer position, furniture moving position, and bus driving position as his "past relevant work," and not the stock clerk position. (R. 797.) The record also indicates that the VE was aware that Plaintiff worked only three days at the stock clerk position. Not only did the VE confirm that she "had an opportunity to review the [Plaintiff's] file" (R. 794), which included that information, the record states that the VE also was "present throughout the entire hearing." (R. 794.) Plaintiff himself confirmed during this hearing that he "worked three days" in the Meijer stock clerk position. (R. 758.) He then explained that he had "two sessions of training" (R. 759), and reiterated that the job "only lasted a few days" (R. 765). Thus, the record as a whole does not show that the VE's assessment of Plaintiff was based on an incorrect assumption. Thus, the ALJ was entitled to rely on her testimony as substantial evidence. *See Young v. Barnhart*, 362 F.3d 995 (7th Cir. 2004).

However, even if the VE based her testimony as to Plaintiff's ability to perform the cashier position on skills he learned at the Meijer job, her testimony as to the 2000 order clerk positions still constituted substantial evidence upon which the ALJ was entitled to rely. *See Coleman v. Astrue*, No. 07-1729, 2008 WL 695045, 269 Fed. Appx. 596, 602, (7th Cir. Mar. 14,

2008); *Lee v. Sullivan*, 988 F.2d 789, 794 (7th Cir. 1993). In *Coleman*, the VE testified that the plaintiff could perform jobs as a hand packer, sorter, or examiner, of which there were approximately 6,500 jobs in the regional economy. *Coleman*, 269 Fed. Appx. at 602. The VE also stated that the plaintiff could perform clerical jobs, of which there were 4,500. *Id.* However, because the ALJ failed to ask the VE whether the plaintiff's past occupations conflicted with the DOT, the ALJ failed to discover that the information clerk position was *not* consistent with the DOT. *Id.* Nonetheless, the Seventh Circuit held that the ALJ's failure to clarify this apparent conflict between the VE's testimony and the DOT constituted harmless error. *Id.* The court reasoned that, even excluding the information clerk positions, the VE's testimony still included a significant number (1,500) of additional order jobs that were consistent with the DOT. *Id.* Thus, as in *Coleman*, even if the cashier position was inconsistent with the DOT, the ALJ's failure to recognize such inconsistency was harmless error because of the 2,000 other order clerk positions available to Plaintiff.

Plaintiff also argues that the VE's testimony is flawed because it conflicts with the Dictionary of Occupational Titles ("DOT"). (Pl.'s Mem. 11.) The conflict, Plaintiff argues, arose because the order clerk and cashier positions "appear semi-skilled" and also "appear to require math skills beyond" Plaintiff's abilities. (Pl.'s Mem. 11.) In response, the Commissioner argues that Plaintiff forfeited his argument because he failed to object to the alleged conflict between VE testimony and the DOT at the administrative hearing. (Def.'s Mem. 8-9.) In addition, the Commissioner argues that there is no conflict between the DOT and the order clerk position because the job is sedentary, unskilled, and required "level 1 math" skills. (Def.'s Mem. 9.)

An ALJ who elicits testimony from a VE about the requirements of the jobs Plaintiff can perform in the economy must determine whether the VE's testimony is consistent with the DOT. SSR 00-4p. To comply with SSR 00-4p, the ALJ must follow a two-step process. *See Prochaska v. Barnhart*, 454 F.3d 731, 735 (7th Cir. 2006); *Overman v. Astrue*, 546 F.3d 456, 463 (7th Cir. 2008). First, if the VE testifies as to the requirements of a particular job, "the adjudicator *has an affirmative responsibility* to ask about any possible conflict between" the testimony and the DOT. *Prochaska*, 454 F.3d at 735 (quoting SSR 00-4p) (emphasis in original). This responsibility is accomplished if the ALJ "[asks] the VE if his testimony [is] consistent with the DOT" at the conclusion of the VE's testimony. *Overman*, 546 F.3d at 463. Second, if there is an *apparent* conflict between the testimony and the DOT, the ALJ must obtain a reasonable explanation for the apparent conflict. *Overman*, 545 F.3d at 463. Thus, this duty only arises where the conflict was "obvious enough that the ALJ should have picked up on them *without any assistance*." *Id.* (emphasis added).

In the present case, the parties do not dispute that the ALJ properly asked the VE whether her testimony conflicts with information provided in the DOT as required by SSR 00-4p before relying on that evidence to support a determination of non-disability. SSR 00-4p; *see also Prochaska,* 454 F.3d at 735. Indeed, the record indicates the ALJ did just that. (R. 798.) Furthermore, Plaintiff does not seem to dispute the contention that he failed to raise any discrepancies between the DOT and the testimony of the VE at the administrative hearing. Instead, the parties appear to dispute the second step: whether the alleged discrepancies between the DOT definitions and the VE's testimony were so obvious that the ALJ's duty to investigate

was triggered, notwithstanding Plaintiff's failure to raise the discrepancies at the hearing. (Pl. Reply 8-9; Def.'s Mem. 8-9.)

Plaintiff identifies only one "apparent conflict" in the VE's testimony that, in his view, required the ALJ to investigate further. (Pl.'s Reply 11.) The VE testified that Plaintiff could perform both the semi-skilled cashier position and the unskilled order clerk position. (R. 798.) Plaintiff contends that this testimony conflicts with the DOT because both positions "appear to require math skills beyond [Plaintiff's]" ability. (Pl.'s Mem. 11.) As the Commissioner points out, however, the "order clerk" in the hotel industry seems fully consistent with the VE's testimony because the job only requires "level 1 math." (Def.'s Mem. 9); *see also* DOT §209.567-014. A mathematical development score of 1 requires only simple arithmetic—which someone with fourth-grade math skills could do—and thus does not conflict with the VE's contention that Plaintiff can perform the order clerk job.

Furthermore, Plaintiff does not show that there was an apparent conflict between the DOT and the cashier job obvious enough that an ALJ would recognize it without any assistance. *See, e.g., Overman*, 546 F.3d at 463 (holding that there was an apparent conflict between the VE's testimony and the DOT because the VE explicitly contradicted himself on cross-examination). There was no mention of Plaintiff's math skills in the VE's testimony, and Plaintiff failed to address the issue on cross-examination at the administrative hearing. In sum, the VE's testimony constituted substantial evidence that Plaintiff can perform a significant number of jobs in the national economy, and the ALJ properly relied on that testimony in support of her findings.

## B.    Sit/Stand Option

Plaintiff argues that the ALJ's finding that Plaintiff can sit for forty-five minutes is not based on substantial evidence and is not properly explained. (Pl.'s Mem. 11.) Specifically, Plaintiff contends that the ALJ should have given more weight to Plaintiffs numerous complaints to medical professionals that he had difficulty sitting for periods shorter than forty-five minutes. (Pl.'s Mem. 14.) Plaintiff also asserts that the ALJ erred in discounting Plaintiff's statements that he could sit only for shorter periods because he did not stand until seventy-five minutes into the 2006 administrative hearing. (Pl.'s Mem. 14-15.) Plaintiff seems to acknowledge that the ALJ's conclusion as to the sit/stand option hinged on her assessment of Plaintiff's credibility. Thus, the proper inquiry is whether the ALJ properly "discounted [Plaintiff's] credibility" despite his complaints to the contrary. (Pl.'s Mem. 14.)

An ALJ's credibility determination is generally deferentially reviewed because the ALJ is in the best position to observe and hear the witness. *Shramek v. Apfel*, 226 F.3d 809, 811 (7th Cir. 2000). Thus, this Court will reverse an ALJ's credibility determination only if the claimant can show it was "patently wrong." *Elder v. Astrue*, 529 F.3d 408, 413-14 (7th Cir. 2008). The ALJ, however, must give specific reasons that are supported by the record as to how she determined credibility. *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001) (citing SSR 96-7p).

In this case, the ALJ supported her credibility determination with sufficient facts and observations. First, she explained that Plaintiff's "subjective complaints far exceed the objective pathology," noting that there was no clear evidence of "disc herniation" or "nerve root or cord compression," and there were no "positive neurological findings consistent with this complaints."

(R. 378.) Second, she explained that Plaintiff's description of the location of his pain was inconsistent; reports of subjective testing were similarly varied. (R. 378.) Third, the ALJ stated that Plaintiff's use of pain medication also is not supportive of a conclusion that he has persistent or pervasive pain. (R. 378.) Fourth, the ALJ thought Plaintiff's prior statements in the record raised concerns about Plaintiff's credibility. (R. 379.)

Finally, and most importantly to Plaintiff, the ALJ also supported her credibility determination on Plaintiff's conduct at the administrative hearing. (R. 379.) The ALJ explained that, despite Plaintiff's contention that he could sit or stand for no more than [twenty] minutes without severe pain, Plaintiff did not stand "until [seventy-five] minutes into the hearing." (R. 379.) Plaintiff argues that this observation warrants overturning the ALJ's credibility determination because "it appears that [Plaintiff] stood up about [forty-five] minutes into the hearing," which is earlier than the ALJ's observation that Plaintiff stood up seventy-five minutes into the hearing. (Pl.'s Mem. 14.) Although the Seventh Circuit disfavors "evidence that can be so easily manipulated as watching whether someone *acts* like they are in discomfort" at an administrative hearing, the Court nonetheless endorses the validity of a hearing officer's observations of the claimant in making credibility determinations. *Powers v. Apfel*, 207 F.3d 431, 436 (7th Cir. 2000). Even if Plaintiff stood up forty-five minutes into the hearing, as Plaintiff contends, that fact is consistent with the ALJ's ultimate determination that Plaintiff should only get a sit/stand option of *forty-five minutes*. On balance, the ALJ provided sufficient support and numerous reasons for her credibility finding regarding Plaintiff's characterization of his limitations. *See Zurawski*, 245 F.3d at 886. She explained why she rejected Plaintiff's complaints as not credible using medical evidence in the record. Moreover, the ALJ did not rest

- 24 -

her determination solely on observing when Plaintiff stood up at the hearing. Accordingly, Plaintiff has failed to show that the ALJ's determination was patently wrong. *See Elder*, 529 F.3d at 413-14.

## C. The ALJ Complied with the District Court's Remand Order

Finally, Plaintiff argues that the ALJ did not fully comply with Judge Keys' remand order, and, therefore, the ALJ's decision should be reversed for legal error. (Pl.'s Mem. 11.) Specifically, Plaintiff argues that, although acknowledging the ALJ "discusse[d] the evidence more extensively than the original ALJ decision," the present ALJ decision fails to address three matters referenced in the remand order. (Pl.'s Mem. 12-13.) First, Plaintiff alleges that the ALJ did not extensively discuss (1) his physical therapy treatments in 2001, (2) the full extent of his treatment at the Hines VA Clinic, and (3) Dr. Shah's evaluation of Plaintiff's ability to work.

To evaluate Plaintiff's claim of insufficient compliance with a prior remand order, the Court should compare the specific of the prior remand order to the ALJ's newer findings. *See, e.g.*, *Lewis v. Astrue*, 518 F. Supp. 2d 1031, 1044-45 (N.D. Ill. 2007) (holding ALJ did not comply with prior remand order's specific instructions to re-evaluate certain medical limitations); *Griffith v. Barnhart*, No. 04-1784, 2004 WL 2806453, at *7-8 (N.D. Ill. Dec. 6, 2004) (rejecting Plaintiff's claim because the ALJ sufficiently addressed the medical limitations pointed out in prior remand order). Here, the ALJ properly satisfied Judge Keys' remand order because she evaluated Plaintiff's relevant treatment records and explained the grounds for her conclusion.

### 1. Plaintiff's Physical Therapy Treatments

In his remand order, Judge Keys explained that the ALJ needed to address Plaintiff's physical therapy sessions between January and March of 2001, and between May and June of 2001. (R. 442.) Specifically, Judge Keys concluded that the ALJ needed to discuss the therapy results including documentation of abnormalities "like paravertebral muscle spasms and limited lumbar range of motion," along with Plaintiff's complaints of pain and limitations during the period. (R. 442.)

On remand, the ALJ properly discussed Plaintiff's physical therapy treatment records and documentation of abnormalities. The ALJ noted:

> Between January and March of 2001 and again between May and June of 2001, the claimant received physical therapy. Following the first course of therapy, [Plaintiff] reported a reduction in pain and radiating symptoms from constant to intermittent and reduction in subjective pain from 8/10 to 1-2/10. Recommendations were than [sic] he avoid excessive straining to the low back region . . . . Following the second course of therapy, during which time the claimant said he was also trying a TENS unit which he said was not helping and was making his pain worse, the claimant reported slight [sic] increase in his low back pain. As he was not making any significant progress and because he was considering going to a pain clinic, physical therapy was discontinued . . . .

(R. 376.) The ALJ also referenced Plaintiff's "limited flexion of the lumbosacral spine and paravertebral muscle spasm, but no atrophy or pain on straight leg raising" in July of 2001. (R. 376.)

### 2. Plaintiff's Treatment at Hines VA Clinic

Judge Keys also instructed the ALJ to discuss Plaintiff's treatment at the Edward Hines VA clinic more completely. (R. 442.) In the 2003 administrative hearing, the ALJ only referred

to notations from treatment received in April and October 2002, instead of the including notations from the full time period during which Plaintiff sought treatment. (R. 442-43.) Additionally, the order faulted the ALJ for failing to discuss evidence from the VA clinic treatment records including a diagnosis of degenerative disc disease, findings of limited lumbar range of motion and paraspinal muscle spasms, noted ineffectiveness of therapeutic treatments to relieve pain, and Plaintiff's persistent subjective complaints of pain and functional limitations. (R. 443.) Critically, however, the Court noted that this explanation did not require the ALJ "to discuss reasons for rejecting *each* report from the VA clinic." (R. 443.) Instead, Judge Keys required the ALJ to explain, on remand, his reasoning for rejecting these and other lines of evidence that supported Plaintiff's claim.

Next, the ALJ properly discussed Plaintiff's treatment at the Hines VA. The ALJ balanced findings that would support Plaintiff's claim with those that did not. For example, the ALJ discussed the diagnosis of degenerative disc disease, commenting that an MRI of the lumbar spine "showed an annular rent at L3-4 and broad-based disc herniation at L5-S1, but there was no central canal lateral recess or foraminal stenosis and the signal intensities appeared normal. (R. 377.) Later, she also noted that another MRI, taken in December 2004, suggested that there were annular tears at L3-4 and L4-5 but explained that the previously noted disc herniation at L5-S1 "appeared much less prominent on the [2004 MRI] and the nerve roots appeared normal." (R. 377.) Likewise, the ALJ also noted that a May 2005 NCV/EMG study "showed no clear electrophysiologic evidence of nerve or root injury affecting the right leg" despite Plaintiff's prior complaints of severe pain affecting the right leg. (R. 376-77.)

The ALJ also discussed Plaintiff's lumbar range of motion and muscle spasms: "claimant had limited flexion of the lumbosacral spine and paravertebral muscle spasm, but no atrophy or pain on straight leg raising." (R. 376.) She contrasted these initial records with a discussion of later evaluations that showed Plaintiff's "range of motion was within normal limits and his manual muscle testing was 5/5." (R. 377.) Moreover, Plaintiff had "full flexion of the back, but limited extension." (R. 377.)

The ALJ also recognized that Plaintiff's physical therapy treatments in 2001 seemed to be ineffective in addressing his pain. (R. 376.) In contrast, she also noted that VA treatment records showed that "he had good relief" following his epidural injections for "more than a year and a half" but that his pain was starting to return. (R. 377-78.) She also noted that Plaintiff's use of pain medication to treat the pain was "inconsistent and not supportive of a conclusion that he had persistent or pervasive pain." (R. 378.)

### 3. Dr. Shah's Evaluation of Plaintiff's Ability to Work

In addition, Judge Keys concluded that the ALJ failed to address Dr. Shah's findings as to Plaintiff's ability to work, and required the ALJ to examine what weight, if any, to give to Dr. Shah's findings on remand. (R. 444-45.) In accordance with the law, the remand order also stated that the ALJ was not required to provide an extensive or detailed discussion of every piece of evidence in the record. (R. 441.) Instead, Judge Keys required a "minimal level of articulation" of the ALJ's assessment of the evidence, including reasons for rejecting lines of evidence that support Plaintiff's claim. (R. 441.)

The Court finds that the ALJ sufficiently complied with Judge Keys' remand order to address Dr. Shah's findings and examine what weight to accord them. Indeed, the ALJ noted that in "January of 2001, Dr. Shah opined that the claimant was unable to work, but by mid-February 2001, he opined that the claimant could do light duty work." (R. 376.) Moreover, the ALJ also referenced Dr. Shah's finding that Plaintiff had "limited flexion of the lumbosacral spine and paravertebral muscle spasm, but no atrophy or pain on straight leg raising" in July of 2001. (R. 376.) The ALJ then explained that she would give greater weight to Dr. Shah's mid-February 2001 finding (that the claimant could do light duty work) because that assessment was consistent with the functional capacity evaluations in September of 2001 and March of 2005 that claimant had greater work abilities than those described by the medical expert. (R. 378.)

In sum, the ALJ did not "pick and choose among the evidence" or "ignor[e] evidence that supports the [Plaintiff's] claim." (Pl.'s Mem. 13.) The ALJ included evidence that supported Plaintiff's claim, but also evidence that could undermine that support. She explained that, based on the entire record, Plaintiff's "complaints far exceed the objective pathology" as the reports of subjective testing were inconsistent and that there were no" positive neurological findings consistent with this complaint." (R. 378.) The ALJ properly considered the observations of evaluating physical therapists and articulated why, in comparison to other medical evidence in the record, such evidence was not supportive of Plaintiff's claim. (R. 378.)

## V.  Conclusion

For the aforementioned reasons, the Court denies Plaintiff's cross-motion for summary

judgment, grants Defendant's motion for summary judgment, and affirms the ALJ's decision.

### ENTER ORDER:

**MARTIN C. ASHMAN**
Dated: April 16, 2010.                    United States Magistrate Judge